UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

NASHVILLE URBAN VENTURE, LLC, )
and VELOCITY IN THE GULCH, INC., )
                                 )
    Plaintiffs,                  )
                                 )    No. 3:09-cv-00699
v.                               )
                                 )    Judge Sharp
CSX TRANSPORTATION, INC.,        )
                                 )
    Defendant.                   )

## MEMORANDUM

Defendant CSX Transportation, Inc. ("Defendant" or "CSX") filed a Motion for Summary Judgment (Docket Entry No. 28), to which Plaintiffs Nashville Urban Venture, LLC ("NUV") and Velocity in the Gulch, Inc. ("VIG") (collectively "Plaintiffs") filed a response in opposition (Docket Entry No. 33), and Defendant filed a reply (Docket Entry No. 38).

## FACTUAL BACKGROUND

Plaintiffs VIG and NUV are two related entities, which own portions of the former CSX Tract 7 property ("Tract 7") sold to AB2, LLC ("AB2"), in 1999.[1] Tract 7 consists of 7.85 acres and is located to the east of 11th Avenue, between 11th and the CSX railroad tracks to the east, and between roughly the Demonbreun Street viaduct to the north and the Icon condominiums to the south. Defendant CSX is a Virginia corporation with its principal place of business in Jacksonville, Florida.

---

[1] Unless otherwise noted, the facts are drawn from the parties' statements of material facts (Docket Entry Nos. 30, 34 and 39) and related exhibits. Although facts are drawn from submissions made by both parties, on a motion for summary judgment, all inferences are drawn in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. ZenithRadio Corp.*, 475 U.S 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

1

VIG is engaged in the business of developing and constructing mixed-use residential and commercial condominiums on certain real estate located in Nashville, Davidson County, Tennessee. (Docket Entry No. 1 at 2). VIG has undertaken site development and construction activity on 3.05 acres located in the Gulch area in the form of an urban residential project known as "Velocity in the Gulch." (*Id*. at 6). This property is comprised of 2.62 acres on Tract 7 and 0.43 acres on Parcel 337.[2]

NUV is the current owner of 3.38 acres, located just south of the Velocity Site and bordered by Pine Street Extension, 11th Avenue South, and the CSX tracks ("Pine Street Flats"). NUV has undertaken site development activity on this property. The Pine Street Flats site consists of 3.07 acres located on Tract 7 and 0.31 acres on Parcel 337.

On May 14, 1999, CSX and AB2 entered into a Purchase Sale Agreement for the 7.85 acres of Tract 7. CSX and AB2 simultaneously entered into an Environmental Agreement. The Purchase Sale Agreement, including the Environmental Agreement, was assigned by C. Mark Carver, Trustee to NUV, in writing on July 26, 2007. Both agreements were then assigned by NUV to VIG in writing on October 31, 2007. The Environmental Agreement, which is at issue in this case, states in pertinent part:

> **Section 1.  Responsibilities of Both Buyer and Seller.**  (a)  Buyer and Seller recognize and acknowledge that there are certain environmental conditions (the "Environmental Conditions") on the Premises that can be reasonably managed to allow the sale of the Premises to Buyer and to allow Buyer to develop the Premises, given certain restrictions regarding site development, construction activities, and the use of the groundwater on the Premises, as set forth in the Feasibility Study and the deed conveying the Premises from Seller to Buyer.
>
> **Section 2.  Seller's Responsibilities.**  (a)  Prior to Buyer's construction activities, as defined herein, Seller shall sample and analyze the soils and/or groundwater to be excavated or removed from those certain Surface and Subsurface Sample Locations Exceeding Risk Levels described on the attached

---

[2] Parcel 337 was acquired at a separate time from the 7.85 acres of Tract 7 and is not subject to this lawsuit.

2

Case 3:09-cv-00699   Document 57   Filed 04/17/12   Page 2 of 15 PageID #: 1079

Exhibit "B". Seller shall analyze said samples for the Contaminants of Concern, as defined in the Feasibility Study. If said excavated soils and/or groundwater do not meet applicable state and federal standards, Seller shall store, treat, and/or dispose of said excavated soils and/or groundwater in accordance with applicable laws and regulations. For purposes herein, Buyer's construction activities shall be defined as those construction activities occurring within ten (10) years of the closing of the sale of the Premises from Seller to Buyer (the "Closing"), in which Buyer excavates soil and/or groundwater on the Premises for the construction of improvements thereon.

(b) Seller is to reimburse Buyer for all Extra Costs, as defined herein, associated with the design and construction of the capping (the "Capping Work") on the Premises, as required by the VOAP, Consent Order, and/or Feasibility Study. The Capping Work shall include the construction of parking areas, building foundations, landscape related soil cover, cover associated with storm water drainage facilities, and other surfaces required to be capped by the VOAP, Consent Order, and/or Feasibility Study. Extra Costs are defined as those costs over and above those certain site design and development costs Buyer would normally incur designing and constructing parking areas, building foundations, landscaping, stormwater drainage facilities, and other surfaces capped by normal d evelopment practices; [sic] if the Premises were not subject to Environmental Conditions.

(c) Seller shall perform additional assessment and remediation activities on the Premises as required by the DEC, VOAP, Consent Order, and/or Feasibility Study, but only to the extent that such additional assessment and remediation is not the result of the actions of the Buyer, its agents, successors, or assigns.

(d) Subject to the specific responsibilities assumed by the Buyer under Section 3 herein, Seller shall indemnify and hold Buyer harmless from any and all costs, expenses, charges, fees, fines, liabilities, claims, duties and obligations related to the environmental condition of the Premises at the time of transfer to Buyer.

**Section 3. Buyer's Responsibilities.** (a) Buyer, at its cost and expense, and subject to reimbursement by Seller for Extra Costs, will design and construct the Capping Work. After completion of the construction of the Capping Work, Buyer, at its sole cost and expense, will maintain the Capping Work in compliance with the VOAP, Consent Order, Feasibility Study, and applicable laws and regulations.

(b) Buyer will perform all site development work and construction activities in a manner that is consistent with the VOAP, Consent Order, Feasibility Study and applicable laws and regulations, and so as to avoid exacerbation of the Environmental Conditions.

3

> (c) If soils excavated and/or groundwater removed by Buyer from the Premises meet applicable state and federal standards, Buyer shall store, treat, and/or dispose of said excavated soils and groundwater in accordance with applicable laws and regulations.
>
> **Section 9.** All rights, duties, and obligations of Seller under this Agreement shall expire within ten (10) years of the Closing.

(Docket Entry No. 31-2).

Prior to the sale to AB2, CSX entered into a Consent Order and Agreement with the Tennessee Department of Environment and Conservation ("TDEC") under the Tennessee Voluntary Oversight and Assistance Program ("VOAP") on May 21, 1997. That Consent Order covers the portions of Tract 7 upon which the Velocity in the Gulch and Pine Street Flats projects are located.

CSX and its consultants performed a Focused Feasibility Study ("FFS") and produced a report dated August 27, 1998. That FFS was a requirement of the VOAP Consent Order. The FFS listed contaminants of concern on Tract 7 at the surface and sub-surface levels "which exceed[ed] the calculated clean up criteria."

In December 1999, the Tennessee Department of Environment and Conservation produced a Record of Decision ("ROD") for the CSX Gulch Site and was signed by James W. Haynes (as Director of the Division of Superfund at TDEC) on February 1, 2000. The ROD considered several remedial alternatives for the CSX Gulch Site, including no action, removal of contaminated soils, bioremediation, and soil capping. The ROD contains a provision titled "DESCRIPTION OF THE SELECTED REMEDY":

> In Consideration of potential future sites residents the remedy requires constructing permanent structures, which seal off and cap the contaminated soils. Both options will minimize and prevent the risks to soil exposure…[t]he restriction also requires appropriate sampling and analyses of site soils, once they

are distributed, to show that they meet or exceed applicable state and federal standards. If soils do not meet these standards and are disturbed through excavation then they must be stored, treated and/or disposed of in accordance with state laws and regulations.

(Docket Entry No. 35-6). Asphalt, concrete, or actual buildings were designated as acceptable covers for soils above state levels. Specific "hot spots" identified in previous samplings were to be characterized and removed if encountered during subsurface construction.[3]

TDEC adopted the Environmental Protection Agency's ("EPA") Region 9 preliminary remediation goals (n/k/a the Regional Screening Levels or "RSLs") as the target clean up levels for sites such as Velocity in the Gulch and Pine Street Flats. (Docket Entry No. 31-8, Plaintiff's Responses to Requests for Admissions No. 11). According to Defendant, soils meeting EPA Region 9 preliminary remediation goals for lead, arsenic, and PAHs could remain on site. Soils above those levels could remain on-site if placed under buildings, asphalt, or landscaping. *See* (Docket Entry No. 34, Defendant CSX Transportation's Statement of Undisputed Facts No. 13). As for arsenic, Plaintiffs' aver CSX's own expert testified that Region 9 preliminary remediation goals are not the applicable standard for arsenic in Tennessee, instead Tennessee uses the background inorganic concentration level (the "background level") of 10 as the standard for arsenic remediation. *See* (Docket Entry No. 35-2, Custer Depo. at p. 33-34).

By letter dated October 30, 2007, TDEC instructed Bertisable Custer[4] that waste from the Velocity site was "suitable for disposal in the Cedar Ridge Landfill contingent upon the following conditions/restrictions:

---

[3] There are twelve (12) hot spots on Tract 7, which were identified in the ROD.

[4] Custer, a Senior Associate at AMEC Earth and Environmental, Inc. ("AMEC"), is an expert for CSX in the present matter. An AMEC representative was on site during the activities in the Gulch.

5

1. No free liquids may be associated with the disposal of the waste;

2. A TCLP analysis shall be performed for arsenic, lead and benzene on a representative sample from each 100 cubic yards of excavated soil. The sample results shall be submitted to [TDEC] prior to that load being transported to the landfill;

3. Notification shall be given to the landfill prior to the shipment of the waste;

4. All the referenced waste shall be disposed in a portion of the landfill that meets the conditions of Rule 1200-1-7-.04(4)."

(Docket Entry No. 35-22).

At least 75% of the Velocity Site is covered by impervious materials sufficient to serve as a cap. The impervious materials on the Velocity Site sufficient to serve as a cap predominantly consist of the actual Velocity in the Gulch building. (Docket Entry No. 36, Phillips Declaration ¶10). In order to construct the Velocity in the Gulch building, substantially more contaminated soil had to be excavated and removed than had been originally estimated. (*Id.*). Thus, according to Plaintiffs, it was necessary to remove the contaminated soils and backfill with approved engineering fill.

All soils removed from the Velocity Site met TCLP standards for arsenic, lead, and benzene and were disposed as non-hazardous "Special Waste Lead and Arsenic Soil" pursuant to TDEC special waste approvals. Of the soils removed from the Velocity Site, the only total metals sampling conducted shows that at least 35% were either under the state standards of Region 9 PRGs, were from Parcel 337, were below background levels, or were brought to the site as clean fill.

Pursuant to the "total metals" testing performed by AMEC on the soils removed from the Velocity site, "at least sixty-five percent (65%) of the soil contained in total

concentrations of these contaminants of concern that exceeded the residential Region 9 PRGs."
(Custer Depo. at p. 71). Specifically, in the Custer report, she stated:

> Based on the analytical data collected, a conservative estimate was prepared and it is my opinion that approximately 35 percent of the volume of the soils removed from the Site are below the Region 9 industrial PRGs for lead and PAHs, below the background level for arsenic, belong to parcel 337, or clean soils that were disposed in stockpiled areas.

(Docket Entry No. 31-12).

A CSX or AMEC employee signed each Waste Manifest, which was required for the removal of soil from the Velocity site and which reflected that each soil batch to be disposed of was "Special Waste Lead and Arsenic Soil." (Phillips Declaration at ¶3). As indicated on the manifests, all soils were non-hazardous and were disposed in a Class 1 municipal solid waste landfill in accordance with Tennessee solid waste regulations. (Docket Entry No. 35-5, Pfotenhauer Depo. at p. 100-102).

During soil removal activities in the summer of 2009, NUV and its contractors removed all surface soils and materials at the Pine Street Flats site to an average depth of three feet, across the entire site. NUV performed no total metals sampling at the time of excavation to determine if soils and materials removed from site in 2009 contained lead or arsenic above applicable state and federal standards. Plaintiffs dispute, however, that any such testing was necessary. Malcolm Pfotenhauer[5] testified at his deposition that "[t]he initial investigations that had been performed had clearly shown that all of the coal waste [on Pine Street Flats] were environmentally impacted and therefore they had to be disposed of and the results had shown that those were not hazardous waste. But they were classified as a special waste . . . ." (Pfotenhauer Depo. at 99-100). Thus, Plaintiffs dispute any

---

[5] Pfotenhauer, an employee of TVG Environmental, Inc., served as an environmental consultant to VIG and NUV during the Gulch construction. *See* (Pfotenhauer Depo. at 65).

7

contention that it was unclear whether soils on the Pine Street Flats site in 2009 contained lead or arsenic above state and federal standards. All soils and materials removed from the site tested below regulatory levels under the TCLP test and were disposed as non-hazardous solid waste or construction debris under special waste approvals.

As of October 19, 2010, the Pine Street Flats site had no development partner, no final development plan, and no building permits. According to Joseph Barker, Plaintiffs did, however, "have a pretty good concept for [their] financing" on the Pine Street Flats project. (Docket Entry No. 35-18, Barker Depo. at p. 143).

To date, Defendant has paid approximately $1,054,563.08 in disposal costs under the Environmental Agreement. According to Plaintiffs, no payment has been made directly to NUV or VIG under the Environmental Agreement. ( Phillips Declaration at ¶8).

This action was filed on July 30, 2009, alleging one count of breach of contract on behalf of each Plaintiff and seeking $2,553,558.00 in damages, plus prejudgment interest and costs. VIG has invoiced CSX for reimbursement of its "Extra Costs and other costs and expenses" in the amount of $865,370.00. NUV has incurred expenses "totaling $1,688,188 in connection with the environmental condition of the Pine Street site." *See* (Docket Entry No. 1).

## **ANALYSIS**

Plaintiffs assert a single claim for breach of contract. Defendant has moved for summary judgment on this claim, wherein it raises several arguments in favor of the Motion. Defendant contends: (1) the Environmental Agreement does not cover the soils and other non-hazardous materials removed from the Velocity in the Gulch and Pine Street Flats sites by Plaintiffs; in the alternative (2) Plaintiffs' actions exacerbated conditions at the sites and thus fell outside the

8

indemnity; and, in the alternative, (3) the work on the Pine Street Flats site was not related to construction and development and thus is outside the indemnity.

## I. Summary Judgment Standard

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Covington v. Knox County School Sys.*, 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. *See Martin v. Kelley*, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986); *Covington*, 205 F.3d at 914 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II. Breach of Contract Claim

"'The essential elements of any breach of contract claim include (1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of contract.'" *Ingram v. Cendant Mobility Fin. Corp.*, 215 S.W.3d 367, 374 (Tenn. Ct. App. 2006) (quoting *ARC LifeMed, Inc. v. AMC-Tenn., Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005)).

The rules underlying construction of a contract are well-known, and have been reviewed by the Tennessee Supreme Court as follows:

> A cardinal rule of contract interpretation is to ascertain and give effect to the intent of the parties. *Christenberry v. Tipton*, 160 S.W.3d 487, 494 (Tenn. 2005). In interpreting contractual language, courts look to the plain meaning of the words in the document to ascertain the parties' intent. *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 889-90 (Tenn. 2002). Th[e] Court's initial task . . . is to determine whether the language is ambiguous. *Id.* at 890. If the language is clear and unambiguous, the literal meaning controls the outcome of the dispute. *Id.* If, however, the words in a contract are susceptible to more than one reasonable interpretation, the parties' intent cannot be determined by a literal interpretation of the language. *Id.*
>
> Contractual language "is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one." *Farmers-Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn. 1975)[.]
>
> When contractual language is found to be ambiguous, the court must apply established rules of construction to determine the intent of the parties. *Planters Gin Co.*, 78 S.W.3d at 890. An ambiguous provision in a contract generally will be construed against the party drafting it. *Hanover Ins. Co. v. Haney*, 221 Tenn. 148, 425 S.W.2d 590, 592 (1968); *Vargo v. Lincoln Brass Works, Inc.*, 115 S.W.3d 487, 492 (Tenn. Ct. App. 2003). Furthermore, when a contractual provision is ambiguous, a court is permitted to use parol evidence, including the contracting parties' conduct and statements regarding the disputed provision, to guide the court in construing and enforcing the contract. *See*, *Memphis Housing Auth. v. Thompson*, 38 S.W.3d 504, 512 (Tenn. 2001).

*Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611-12 (Tenn. 2006).

### A. Whether the soils and other materials removed from the Velocity in the Gulch and Pine Street Flats sites were subject to "environmental conditions" covered by Section 2 of the Environmental Agreement.

Defendant avers that Plaintiffs' claim is based "on the proposition that CSX retained liability for all costs theoretically related to any prior uses of the Tract 7 property, even when those costs far exceed the original $2.2 million paid for the property and were for materials that were clean or could have been capped in place under the VOAP." (Docket Entry No. 29 at 17). Defendant goes on to state, Plaintiffs believe that "the Environmental Agreement made CSX a silent partner in their development—one designated to bear all of the losses and none of the profits." (*Id.*).

In particular, Defendant claims that under Section 2(b) of the Environmental Agreement, CSX "'is responsible for 'Extra Costs' of 'Capping Work,' *i.e.,* marginal costs of asphalt, concrete, buildings or other capping over soils exceeding state and federal standards (Region 9 PRGs) as required by TDEC under the VOAP."' (*Id.*). By its plain language, Defendant asserts contrary to Plaintiffs' belief, the Environmental Agreement does not require CSX to bear all costs of managing soils at the property. Further, Defendant asserts that Section 2(d) provides a limited indemnity for costs related to "environmental conditions of the Premises at the time of transfer to Buyer," arguing that "environmental conditions" are "plainly those hazardous substances requiring remediation under the VOAP." (*Id.* at 18). Because the plain language of the Environmental Agreement construed as a whole shows that "environmental conditions" were limited to hazardous substances exceeding state and federal standards and not covered by a cap, Defendant asserts it is entitled to summary judgment or partial summary judgment.

In contrast, Plaintiffs contend that the soil removed from the Velocity and Pine Street Flats sites were subject to environmental conditions and all of Plaintiffs' remediation costs are subject to indemnification by Defendant per the Environmental Agreement. (Docket Entry No. 33 at 12). They argue, contrary to Defendant's representations, "Environmental Conditions" is not defined in Section 1(a) by reference to any scientific standard or to the VOAP. Rather, "Environmental Conditions" as it is "broadly defined in Section 1(a) refers to those contamination issues on site that could impede the development of Tract 7 in the absence of careful management." (*Id.*).

"Whereas Section 2(b) specifically addressed the narrow issue of extra costs associated with Capping Work, Section 2(d) clearly shifts to CSX the totality of any other contingency of costs incurred because of the unique condition of the property." (*Id.* at 15). Plaintiffs contend "[a]s used in Section 2(d), the term [environmental condition] unambiguously refers to contamination in its broadest sense. (*Id.* at 16). Even if the terms were indistinguishable, Plaintiffs claim Defendant is nevertheless not relieved of its indemnity obligations. (*Id.* at 17).

When read in its entirety, the Court finds the language of the Environmental Agreement ambiguous as it relates to the terms "environmental conditions" and "extra costs" wherein those terms are of "uncertain meaning and may be fairly understood in more than ways than one." *See Clemmer*, 519 S.W.2d at 805. As such, it is sufficient to raise a genuine issue of material fact on the issue of whether the removal of soils and other materials from the sites were subject to environmental conditions.

**B. Whether Plaintiffs' actions were consistent with the VOAP and exacerbated conditions at the Velocity in the Gulch and Pine Street Flats sites and thus fall within the exceptions set out in Section 3 of the Environmental Agreement.**

Alternatively, Defendant contends even if Plaintiffs' expansive reading of "environmental conditions" to include non-hazardous materials from any prior use was supported by the text, they overlook the conditions imposed on them by Section 3(b) and 3(c). (Docket Entry No. 29 at 19). The limitations on Defendant's indemnity obligations necessitate Plaintiffs to perform work consistent with the VOAP and so as not to exacerbate conditions at the site. (*Id.*). Since Plaintiffs failed to meet these duties, no obligation to indemnify arises under Section 2. (*Id.*). Because the activities undertaken by Plaintiffs at Velocity and Pine Street Flats were not consistent with the VOAP program requirements for those sites, and because their actions exacerbated conditions, Defendant claims it is entitled to summary judgment or partial summary judgment on their claims for those costs.

Plaintiffs state "[a]ccording to CSX, the Plaintiffs exceeded the requirements of the VOPA, Consent Order, and Feasibility Study by excavating, removing and disposing of (under TDEC's oversight) the contaminated soil." (Docket Entry No. 33 at 20). Plaintiffs claim that this contention is flawed in two correlated ways – (1) CSX "selectively picks phrases out of context from these documents to suggest the only remediation the buyer was to undertake was to cap the contaminated soil with cover of some sort" and (2) CSX "ignores other provisions of the regulatory documents that expressly discuss excavation, removal and off-site disposal of contaminated soil." (*Id.*). As to the contention that Plaintiffs exacerbated conditions at Tract 7, Plaintiffs assert they "turned a contaminated wasteland[,] which had been largely dormant for decades into a mixed use residential and retail complex of great benefit to Nashville, and to the community in the Gulch." (*Id.* at 25). Ultimately, it is no defense to the breach of contract

13

claim, Plaintiffs aver, that the "eventual soil remediation exceeded the original soil removal projections…" (*Id.* at 26).

Defendant refutes this argument by stating, "[b]y going beyond the approved capping remedy for their own commercial design reasons, Plaintiffs acted inconsistently with the VOAP requirements, exacerbated conditions at the site, and took themselves outside the scope of the [S]ection 2 indemnity." (Docket Entry No. 38 at 8).

Plaintiffs have presented sufficient evidence to raise a material question of fact as to whether the requirements of the VOAP, Consent Order and Feasibility Study were exceeded; and consequently, a material dispute of fact exists as to whether the condition of Tract 7 was exacerbated.

**C. Whether the Pine Street Flats costs were incurred as part of Construction Improvements covered under Section 2 of the Environmental Agreement.**

Alternatively, Defendant contends even if Plaintiffs' claims were not outside the limited indemnity under Section 2 or disqualified under Sections 3(b) and (c), their claim for $1.68 million on the Pine Street Flats site would be barred because it did not arise from ongoing or planned site development and construction. (Docket Entry No. 29 at 20). Rather, NUV chose to conduct its own "remediation" of soils at Pine Street Flats "days before the expiration of the ten-year limit on CSX's obligations under the Environmental Agreement." (*Id.*). Having had a full ten years to resolve "a final use, obtain plans, financing, and permits, and begin construction," NUV failed to do so. (*Id.*). Because the Pine Street Flats "gross soil removal on a still-vacant lot does not constitute "construction of improvements" within ten years of closing," Defendant claims it is entitled to summary judgment or partial summary judgment on the $1,688,188.00 sought by NUV. (*Id.* at 21).

14

Plaintiffs assert that "CSX improperly attempts to limit the breadth of Section 9 of the Environmental Agreement only to costs of construction activities… [this section] actually states that '*[a]ll rights, duties and obligations* of Seller under this Agreement shall expire within ten (10) years of the Closing.'" (Docket Entry No. 33 at 27) (emphasis in original). Plaintiff continue, "[t]he 'rights, duties and obligations' of CSX described in Section 9 clearly include its obligation to indemnify Plaintiffs for all costs 'related to the environmental condition of the Premises….' Section 2(d)." (*Id.* at 29). Moreover, Plaintiffs argue that "the costs incurred on the Pine Flats property were necessary as a direct consequence of the environmental condition of that site." (*Id.*).

Although it appears clear from the record that NUV chose to remove soils at the Pine Street Flats site prior to the ten year expiration of the Environmental Agreement, material disputes exists as to whether NUV excavated soil "for the construction of improvements."

## CONCLUSION

For all of the reasons stated, material disputes of fact preclude summary judgment for Defendant on Plaintiffs' breach of contract claim. Therefore, Defendant's Motion for Summary Judgment (Docket Entry No. 28) is hereby DENIED.

An appropriate Order shall be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE

15

Case 3:09-cv-00699   Document 57   Filed 04/17/12   Page 15 of 15 PageID #: 1092